### JANNEY v. PAN-COAST VENTILATOR & MFG. CO.

(Circuit Court, E. D. Pennsylvania. February 23, 1904.)

#### No. 20.

1. TRADE-NAMES—RIGHT TO PROTECTION BY INJUNCTION—EFFECT OF NONUSER.
   The owner of patents for an article of manufacture, and also of the exclusive right to use the name of the patentee as a trade-name in connection with such article, may maintain a suit to enjoin the use of such name by another in connection with an article of the same kind, but not made under the patents, although he is not at the time manufacturing the patented article, nor is it being made or sold by others.

2. SAME—NAME OF PATENTEE—USE IN CONNECTION WITH DIFFERENT ARTICLE.
    Complainant acquired by assignment certain patents for ventilators:
    issued to Pancoast as inventor, and also the exclusive right to use the
    name "Pancoast" as a trade-name upon the patented article. Defendant,
    incorporated under the name "Pan-Coast Ventilator & Manufacturing Com-
    pany," having been enjoined from infringement of the Pancoast patents,
    commenced the manufacture and sale of a different ventilator, upon which
    it placed its corporate name, and which it advertised as "Improved Pan-
    Coast" and "New Pan-Coast." *Held*, that the use of the name "Pancoast,"
    or its equivalent, "Pan-Coast," was without right, especially on a different
    article from that of the patents with which it had always been associated,
    and was an infringement of complainant's rights as owner of both the
    patents and the trade-name, which entitled him to an injunction.

In Equity. Suit for infringement of trade-name. On motion for
preliminary injunction.

See 122 Fed. 535; 124 Fed. 972.

Albert B. Weimer, for complainant.
A. T. Johnson and A. B. Stoughton, for respondent.

J. B. McPHERSON, District Judge. The undisputed facts of this
case are as follows: Richard M. Pancoast, the inventor, took out let-
ters patent No. 476,682 and 605,508, for improvements in ventilators,.
and on September 16, 1896, assigned his interest therein to the Pan-
coast Ventilator Company (hereinafter called the "Ventilator Com-
pany"), which began to manufacture the patented article. In May,.
1897, Pancoast agreed in writing with the Ventilator Company "that
he will allow the exclusive use by this company, its assigns or succes-
sors, to their using the name 'Pancoast' as the name or trade-mark by
and under which their ventilators shall be known or sold." In De-
cember, 1898, the directors of the Ventilator Company passed a resolu-
tion accepting the proposal of Joseph C. Henvis, who was president
of the company and a large stockholder, to "purchase all the U. S. and
Canadian patents, and also all patent rights, improvements, contracts,
patterns, braces and business and all other property, except book ac-
counts, now owned by this company, in consideration" of the issue of
certain stock in a new company to be organized, and empowered the
secretary "to make and deliver all proper assignments and transfers
of said letters patent, all rights and improvements, and to deliver all
patterns, braces, cuts, and all other property, except book accounts,
now owned by this company, to the said Joseph C. Henvis, his ex-
ecutors or assigns." What the secretary did under this resolution, does
not distinctly appear—apparently nothing, so far as the patents are
concerned, for on January 30, 1899, the Ventilator Company assigned
them to Henvis as collateral security for a debt. In June, 1899, the
Ventilator Company having become insolvent and having been placed
in the hands of a receiver, the National-Pancoast Ventilator Company
(hereinafter called the "National Company") was organized, and Henvis
and the Ventilator Company joined in assigning the patents to the Na-
tional Company. The assignment recited that the patents had been
transferred to Henvis as collateral security, going on to say, "And
whereas the said Joseph C. Henvis and the said Pancoast Ventilator
Co. are now the sole owners of the said patents, and of all rights un-

der the same; and whereas the said National Pancoast Ventilator Co., a corporation of the state of New Jersey, is desirous of acquiring the entire interest in the same;" and then assigning and transferring "the whole right, title and interest in and to the said improvement in ventilators and to the letters patent therefor, aforesaid." A day or two afterwards the patents were assigned by the National Company to Joseph A. Janney, Sr., the present complainant. The assignment was on its face an absolute transfer, but a collateral agreement was made the next day, by which the patents were to be reassigned to the National Company when certain conditions were complied with. These conditions were not complied with, however, and the patents continued to be the absolute property of Janney, as was decided in Janney v. Pancoast International Ventilator Co. (C. C.) 122 Fed. 535. Meanwhile Henvis organized a third corporation, the Pancoast International Ventilator Company (hereinafter called the "International Company"), and began to manufacture the patented article and to sell it as the "Pancoast," and later as the "Pan-Coast," ventilator. The suit just referred to was brought to restrain this infringement, and a decree was entered in due course on April 1, 1903, in favor of the complainant. This decree was disobeyed by Henvis and his company,' and in September, 1903, he was adjudged in contempt, and required to pay a fine and costs: Janney v. Pancoast International Ventilator Co. (C. C.) 124 Fed. 972. About this date he procured a fourth charter in New Jersey for the Pan-Coast Ventilator & Manufacturing Company, the present defendant, of which he is president. He continued to carry on the business of manufacturing "Pan-Coast" ventilators under this corporate name, and in a short time a second charge of contempt was made. Janney alleged that Henvis was still manufacturing the patented article, and a second hearing was had, in which Henvis himself swore, and offered other evidence to prove, that he was no longer manufacturing ventilators under the Pancoast patents, but that he was selling ventilators made after the model of an expired patent, issued not to Pancoast, but to another person. The matter was referred to an examiner to take testimony, but at this point of the proceeding the complainant abandoned the charge, and in lieu thereof has filed the present bill to restrain the use of the word "Pan-Coast" on the ventilators made by the defendant. The business is being conducted by Henvis in the same manner as it has been conducted since the time when the International Company was organized. Janney has never manufactured any ventilators under the patents, and none is now being made by any one, so far as I am informed.

It is conceded that "Pan-Coast" is a mere attempt to avoid what might be the consequences of using the word "Pancoast," and no time need be spent in considering the slight difference between the two names. For present purposes they are identical. As will be seen at once, the situation presented by these facts is unusual. Ordinarily a suit to restrain the use of a trade-mark or a trade-name is brought by a manufacturer whose business is thought to be injuriously affected by an offending rival, but the present complainant does not manufacture the article referred to, and the only injury he sets up in the bill is found in paragraph 9, which contains the following language:

"Your orator is advised, and therefore avers, that, as owner of the patents hereinbefore mentioned, he is the only person entitled to use the word 'Pancoast' in connection with ventilators, and that the defendant, in using the name 'Pancoast' or the word 'Pan-Coast' in its corporate title, in its letter heads and bill heads, advertisements, and on the ventilators themselves, is acting in fraud of your orator's rights. In using the word 'Pan-Coast,' as applied to ventilators, the defendant is not only appropriating a trade-mark and a trade-name which your orator has the exclusive right to use in connection with ventilators, but is also engaged in gross unfairness of trade, as it is seeking to sell to the public, as Pancoast ventilators, ventilators which, according to the statements made by its president and counsel in open court, are not Pancoast ventilators."

In my opinion, however, this is a sufficient foundation for the complainant's right of action. He has a clear title to the patents, and an equally clear right to continue the use of the name "Pancoast" as a trade-name upon the patented article. This right the defendant is usurping, and its usurpation is not justified by the fact that the complainant is, for the moment, not manufacturing the ventilator or using the name. It is perfectly clear, also, that the defendant has no right whatever to use the trade-name "Pancoast," or its equivalent, "Pan-Coast." The name has by continuous use during several years become inseparably associated with ventilators made under the patents owned by the complainant, and the defendant is not selling this kind of ventilator, and does not claim to be selling it. The circulars sent out by the defendant speak of the "Improved Pan-Coast," or the "New Pan-Coast," or the "New Improved Pan-Coast," but the vice of all these designations is that they retain a trade-name to which the defendant has no right. Unquestionably the defendant is striving to get the advantage of whatever reputation the patented article may have acquired, and to make the public believe that the essential qualities of the article are still retained, while improvements have been added. If the complainant were manufacturing the ventilator of the patents, a clear case of unfair competition in trade would be presented, and I cannot see wherein the situation is rendered materially different by the fact that such manufacture is not now being carried on. Suppose the complainant had been manufacturing the patented ventilator, but had closed his factory, with no present intention of resuming business. Surely he would not lose the right to his trade-name merely because he had ceased to use it. His predecessor in title did use it, and did manufacture the article, and I think he has succeeded to the same right.

The defendant's claim of title is wholly without foundation. No doubt the agreement of May 13, 1897, gave to the Ventilator Company the exclusive use of the name "Pancoast," but only "as the name or trademark by and under which their ventilators shall be known or sold," and not as a mere abstract piece of property. As the Ventilator Company was then the owner of the patents, and was manufacturing the patented article, there was no attempt by this agreement to sever the right to use the name from the right to make the article. Whether this can ever be done is a doubtful proposition. It is true that the owner of a patent, who has given his name as a trade-mark for the patented article, may transfer both the patent and the exclusive right to the name, and may thus disable even himself from using the trade-name on articles of a similar kind: Le Page Co. v. Russia Cement Co., 51 Fed. 943, 2 C. C. A. 555, 17 L. R. A. 354; Burton v. Stratton

**(C. C.) 12** Fed. 703. And in Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769, the Supreme Court say:

"As to the right of Pike to dispose of his trade-mark [which was his own name] in connection with the establishment where the liquor was manufactured, we do not think there can be any reasonable doubt. It is true, the primary object of a trade-mark is to indicate by its meaning or association the origin of the article to which it is affixed. As distinct property, separate from the article created by the original producer or manufacturer, it may not be the subject of sale. But when the trade-mark is affixed to the articles manufactured at a particular establishment, and acquires a special reputation in connection with the place of manufacture, and that establishment is transferred, either by contract or operation of law, to others, the right to the use of the trade-mark may be lawfully transferred with it."

See, also, Paul on Trade-Marks, §§ 18, 120, 121.

However this doubt should be resolved when the question is distinctly raised in a proper case, it is clear to my mind that, under the facts now in evidence, whatever Henvis may have got by the resolution of the board of directors of the Ventilator Company on December 10, 1898, he transferred it in June, 1899, to the National Company, and has never regained the title to it since. The resolution did not mention the trade-name at all. It speaks in general terms of "patent rights, improvements, contracts, patterns, braces, and all other property except book accounts," and therefore the trade-name must have been included, if at all, merely by implication. If it was so included, it was by implication transferred by the assignment of June 14, 1899, to the National Company, for the assignment recites that Henvis and the Ventilator Company are now "the sole owners of the said patents and of all rights under the same," and that the National Company is desirous of acquiring "the entire interest in the same," and thereupon assigns "the whole right, title and interest" in the patents to the National Company for its own use "as fully and entirely as the same would have been held and enjoyed by the said Joseph C. Henvis and the Pancoast Ventilator Co., had this assignment and sale not been made." Certainly, as it seems to me, further discussion is needless. The patents and the trade-name had never been separated, and the right to use the name upon ventilators is now the exclusive property of the complainant. The defendant has not a shadow of title either to the patents or to the name, and it seems a waste of time to pursue the subject further.

A decree may be drawn granting the preliminary injunction upon the usual terms.