40 C.C.P.A. (Patents)

SCHULMERICH ELECTRONICS, Inc. v. J. C. DEAGAN, Inc.

Patent Appeals No. 5912.

United States Court of Customs and Patent Appeals.

March 11, 1953.

Pollard & Johnston, New York City (Albert C. Johnston and D. Verner Smythe, New York City, of counsel), for appellant.

Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill. (Carlton Hill, Chicago, Ill., of counsel), for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

GARRETT, Chief Judge.

This is an appeal from the decision of the Commissioner of Patents, speaking through the late Assistant Commissioner Ernest F. Klinge, affirming the decision of Examiner of Interferences A. D. Bailey, sustaining the opposition of appellee to appellant's application, serial No. 506,968, filed in its present form February 5, 1948, for the registration on the principal register under section 2(f) of the Trade-Mark Act of July 5, 1946, Ch. 22 of Title 15, U.S.C.A.,

§ 1051 et seq., of the notation "Carillonic Bells" as a trade-mark for "Electrically operated Carillons or Chimes." Use of the notation on appellant's product is alleged to have begun "in or about January 1941," which was more than five years prior to the filing date.

It is a part of the history of the case, as shown by the record, that appellant first filed an application on August 6, 1946, which received the serial number 506,968, for registration of the notation "in accordance with the Trade-Mark Act of 1920," which act admitted of the registration on a special register under conditions described in the act, of certain types of marks, including descriptive and name marks, not registrable under the Trade-Mark Act of February 5, 1905.

After an action by an examiner on April 10, 1947, which has no present bearing on the controversy, appellant on February 5, 1948, substituted the application here involved, the serial number of the first application being retained.[1]

In his decision, the Assistant Commissioner quoted with approval the following comprehensive description of the type of goods manufactured by the respective parties, given by the Examiner of Interferences in his decision of October 12, 1950:

"The carillonic devices sold by both parties are modern developments designed to simulate the musical performances of traditional companiform carillons. Such carillons, of which there are two distinctive types, Flemish and English, are composed of sets of stationary, cast, cup-shaped bells of progressive varying sizes, which in general are tuned to the chromatic scale over a range of three or more octaves, and may be rung either manually or mechanically. They are of the familiar type commonly mounted in belfries of churches, and to some extent in other tower structures of religious or educational institutions or the like.

"Companiform carillons of the traditional kind ordinarily cost many thousands of dollars, and the usual installation thereof also involves large expense for a belfry or tower of a size and structure to accommodate the bells, which in the aggregate may exceed 50,000 pounds of weight. The products of both parties, although closely imitating traditional carillons in musical effects, differ widely therefrom in structural characteristics, and are relatively inexpensive. The applicant's product is an electronic apparatus comprising a series of vibratory sound elements consisting of small metal rods in graduated sizes ranging up to 18 inches in length, each of which is associated with a hammer. The hammer is electrically controlled from a keyboard console or similar apparatus, and when actuated, strikes the rod to produce a bell-like sound which, if unamplified, would be inaudible beyond the limits of a good sized room. An electronic system modifies and amplifies this sound, which is projected in suitable volume by an electrodynamic speaker. This instrument of the applicant's manufacture may be operated from separate consoles, either manually or mechanically, or from organ keys controlled by a stop, and are made to simulate the musical effects of both English and Flemish type carillons. The speakers are of negligible size and may be placed in any convenient location within a building or any available belfry or tower. The applicant's products sell from about $1,700 to $20,000 for instruments varying from 25 to 61 notes; and since the applicant's entry into the field in or about 1941, it has had sales thereof, mostly to churches, valued at about $2,500,000 and involving over 700 installations in an area comprising a majority of the states and a number of foreign countries.

"As indicated by its exhibits 4 and 6,

1. The Trade-Mark Act of 1946, often referred to as the Lanham Act, was approved by the President July 5, 1946, its effective date being fixed by section 46 (a) at "one year from its enactment," but section 47(a) provided that all applications pending on the effective date might be amended, if practicable, to bring them under the provisions of the 1946 Act.

the opposer's products, which are marketed under the notation 'Deagan Carillons,' comprise a set of modified tubular bells or chimes adapted to be mounted in a belfry or tower. These bells without amplification closely reproduce the tones of traditional carillons, and are electrically operated, either manually from a keyboard or automatically by mechanical means. The tower unit of this device, consisting of a frame supporting the bells and associated mechanisms, occupies but a fraction of the space required for a comparable set of companiform bells. The cost of the opposer's carillons varies in proportion to the number of bells, ranging in basic price, exclusive of belfry and associated equipment costs, at around $9,000 for the 10-bell device, to about $20,000 for the 25-bell instrument, etc. The opposer's sales from 1920 through 1948 are estimated at close to 500 instruments, valued at 4¾ million dollars, of which about 45 installations have been made since 1941."

On April 30, 1948, appellee filed its notice of opposition stating the grounds of same as follows:

"1. Opposer is, and for many years prior to January, 1941, the date alleged by applicant as the date of adoption of its alleged trade mark used by it, has been engaged in the business of manufacturing and selling Carillons in interstate commerce.

"2. The term 'Carillonic Bells' is not a trade mark, nor can it function as a trade mark.

"3. The Term 'Carillonic Bells' is not being used as a trade mark by the applicant.

"4. As purportedly used by applicant, the term 'Carillonic Bells' is a misnomer, and the products enumerated in the said application, namely, electrically operated carillons or chimes, is not a proper or true designation or description of said products.

"5. Applicant is not entitled to reg-istration under Section 2(f) or any other section, of its alleged trade mark 'Carillonic Bells', in view of the fact that said term as used by applicant is misdescriptive and misleading when applied to the goods sold by applicant.

"6. Applicant is not entitled to registration because the use of the mark sought to be registered violates Section 43(a) of the Act of 1946.

"7. Attached hereto are two photostatic copies of applicant's booklet entitled 'Deagan Carillons' which shows and describes applicant's true carillons.

"8. Opposer, who, for many years, has been engaged in the manufacture and sale of true carillons, has built up a very valuable good will in its said business, and has spent considerable sums of money in advertising and popularizing its said products. The use by applicant of its alleged trade mark 'Carillonic Bells' upon products which are not true carillons seriously damages applicant's business in the sale of carillons.

"9. Opposer and applicant are competitors, both being engaged in selling to the same class of purchasers.

"10. If applicant were permitted to use and register its alleged trade mark 'Carillonic Bells' for its products improperly termed carillons or chimes, confusion in the trade will arise, with resulting damage to applicant and others who manufacture and sell true carillons.

"11. If applicant were granted the registration herein opposed, it would be placed in a position to harass and cause annoyance to opposer and its customers."

Appellant first responded to the notice of opposition with motions filed July 21, 1948 (a) to strike all or specified parts of the notice for immateriality; and, (b) to dismiss the notice because of the alleged failure to state facts on which the opposition might properly be sustained.

The Examiner of Interferences denied both motions in a decision rendered August

24, 1948 [2] and adhered to his denial in a decision rendered September 16, 1948, in response to a request of appellant for reconsideration.

On October 6, 1948, appellant filed its answer to the notice of opposition, and, on that same date, filed a petition to the Commissioner reading in part:

"Applicant respectfully petitions the Commissioner of Patents in the exercise of his supervisory authority (1) to direct that the notice of opposition filed April 30, 1948, be dismissed by the Examiner of Interferences and (2), if the opposition be permitted to continue, to direct that paragraphs 4, 5 and 6 of the notice be stricken so as to exclude the matters they allege from the issues subject to proofs and adjudication in this proceeding."

The petition was denied by former Assistant Commissioner Joe E. Daniels on the ground that the case was not a proper one for exercise of the Commissioner's supervisory authority without indicating any opinion on the merits of the issues ultimately to be determined.

Appellant's answer to the notice of opposition was filed October 6, 1948, the pertinent portions being couched in the following terms:

"1. Applicant admits the matters alleged in paragraphs 1 and 9 of the notice of opposition.

"2. Applicant denies all the matters alleged in paragraphs 2, 3, 4, 5, 6, 7, 10 and 11 of the notice of opposition.

"3. Applicant lacks knowledge or information sufficient to form a belief as to the truth of the matters alleged in the first sentence of paragraph 8 of the notice of opposition and therefore denies the same; and applicant denies the allegations in the second sentence of that paragraph.

"4. Further answering the notice of opposition, applicant states that the same fails to state a claim upon which relief can be granted and moves that it be dismissed for the reason that it does not allege facts showing that opposer would be damaged by the registration of the trade-mark forming the subject of applicant's application Serial No. 506,968.

"5. Further answering the notice of opposition, applicant states that the matters alleged in paragraphs 4, 5, and 6 and the second sentence of paragraph 8 thereof are immaterial to the registrability of said trade-mark upon said application and applicant moves that the same be stricken and excluded from issues to be determined in this proceeding.

"6. Further answering said notice of opposition, applicant states that the Commissioner of Patents is without jurisdiction to adjudicate the matters alleged in paragraphs 4, 5 and 6 thereof; the same being merely complaints by the opposer, related to the jurisdiction of federal courts with respect to actions under Section 43(a) of the Act of 1946, or to the jurisdiction of the Federal Trade Commission, against applicant's uses of the mark 'Carillonic Bells' and against alleged relationships between some supposed meaning of the mark and the character or quality of applicant's electrically operated carillons or chimes."

The portion of Section 2 here involved reads:

"No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

\*   \*   \*   \*   \*   \*

"(e) Consists of a mark which, (1) when applied to the goods of the applicant is merely descriptive or deceptively misdescriptive of them, \* \*.

"(f) Except as expressly excluded in paragraphs (a), (b), (c), and (d) of this section, nothing herein shall pre-

---

2. The Examiner of Interferences seems to have sustained a motion to strike an amended notice of opposition presented by appellee because not timely filed. That has no bearing upon the issues now involved.

vent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration."

▊▊ The Lanham Act undoubtedly admits of registrations on the principal register which could not have been admitted properly under the Act of 1905. For example, a notation merely descriptive of the goods to which it is applied may be registered when it has acquired a distinctive meaning as applied to an applicant's goods and five years exclusive and continuous use during the period "next preceding the date of the filing of the application" may be accepted as prima facie evidence of the distinctiveness required, but such right of registration, in our opinion, exists only with respect to notations, symbols, etc., which are capable of indicating the origin of a product; not just the name of a product. One properly may not procure the exclusive rights appertaining to a registered trademark when the mark consists of nothing more than the name of the object to which applied.

The brief on behalf of appellant before us seems to go so far as to contend that a mark which is "deceptively misdescriptive" within the meaning of Section 2(e), supra, properly may be registered if it be distinctive of an applicant's goods.

We do not share that view, but we are not called upon to pass upon that question in this decision. All the allegations of misdescriptiveness in the paragraphs of appellee's notice of opposition, including whatever implication of false description may be implied from the claim in paragraph 6, relating to the violation of Section 43(a), 15 U.S.C.A. § 1125(a), were decided adversely to appellee by both the Examiner of Interferences and the Assistant Commissioner, the latter saying:

"It has been argued by the opposer that the term 'Carillonic Bells' is misdescriptive as applied to applicant's instrument which is not a true carillon because it does not in fact comprise bells as do true companiform carillons, as that word is generally understood. However, the instrument is played like the original of which it is an imitation, sounds the same to the average listener and is adapted to all the usual musical uses and limitations characteristic of the type of instrument of which it is substantially the equivalent. It is my view that the applicant's mark is not deceptively misdescriptive *but is a generic term characterizing the goods to which it is applied.* For that reason, the mark is inherently incapable of functioning as a trade-mark to distinguish the origin of applicant's goods in commerce." (Italics ours.)

There was no appeal from that holding by appellee here, nor any discussion of misdescriptiveness in the brief filed on appellee's behalf. In consequence, misdescriptiveness will not be further discussed herein.

▊▊ Any notation, to be registrable, of course, must be a trade-mark as that term is legally defined and understood. Webster's New International Dictionary gives the following definition which is in harmony with those given by all lay and legal lexicographers whose works have been available for our examination:

"A peculiar distinguishing mark, device, or symbol affixed by a manufacturer, merchant, or trader to his goods in order to identify them as his goods, and to distinguish them from the goods manufactured, sold, or dealt in, by others; hence, specif., such a mark *the exclusive right to the use of which is recognized by law.*" (Italics ours.)

▊ In the case of Kellogg Company v. National Biscuit Company, 305 U.S. 111, 59 S.Ct. 109, 113, 83 L.Ed. 73, the notation "shredded wheat" was held to be generic by the Supreme Court of the United States—that is, it was held to be the name of a product—and it was said: "Since the term is generic, the original maker of the prod-

uct acquired no exclusive right to use it." The court said further, as expressed in one of the headnotes of the decision:

"To establish, by application of the doctrine of secondary meaning, the exclusive right to 'shredded wheat' as a trade name, the claimant must show that *the primary significance of the term in the minds of the consuming public is not the product but the producer.*" (Italics ours.)

The term "trade name" was used in the body of the decision and in the headnote, because the term there involved was involved as a trade name, but it is not supposed that there can be any doubt that the principle stated applies with equal or even greater force to a trade-mark.

We do not lose sight of the fact that the decision was rendered in that case in November, 1938, which was many years before the enactment of the Lanham Act here involved, but we find nothing in the latter act which, in our opinion, renders inapplicable the principle or rule announced in the Supreme Court's decision.

It is true that the concluding sentence of Section 2(f), supra, states:

" * * * The commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding the date of the filing of the application for its registration."

It will be noted that the provision reads "may"—not "must" accept, etc., but there need be no quibble here about that distinction.

■ As we view it, the phraseology quoted does not imply that evidence that a notation *which is inherently incapable of functioning as a trade-mark by indicating origin,* can be made a legal and, therefore, a registrable trade-mark by proving its continuous use for five years "next preceding the date of the filing of the application for its registration."

■ So far as we are aware—and we have examined many cases—neither the Commissioner of Patents nor any court has, since the decision in the Kellogg case, supra, held such a notation registrable under any trade-mark registration statute, including the Lanham Act. However that may be, no decision of the Supreme Court of the United States has come to our attention which overruled, even by implication, the principle of that decision and it remains the law which we deem particularly applicable in this case.

Other pertinent cases were cited by the Examiner of Interferences and the Assistant Commissioner, whose comprehensive decisions will be found of interest to all members of the public who may be, or who may become, concerned with the questions here at issue.

In the course of his decision the Examiner of Interferences after quoting dictionary definitions of "carillon" and "bells" said, *inter alia:*

"It is the opinion of the examiner [of interferences], * * *, that although 'Carillonic Bells' properly describes the applicant's goods, it does so in a generic sense. The suffix 'ic' is defined by Webster as meaning 'of or pertaining to (that which the root word denotes), * * * after the manner of, characteristic of, resembling * *'

" 'Carillonic Bells', therefore, literally signifies 'bells of a carillon', 'bells resembing those of a carillon', and the like, and hence it is deemed manifestly to be inherently incapable of identifying the applicant's goods to the exclusion of any device comprising carillonic as distinguished from other kinds of bells. *And it has always been the rule that any such generically descriptive term may not be exclusively appropriated as a trade-mark, regardless of how long a claimant fortuitously may have enjoyed the exclusive use thereof in trade.* Kellogg Company v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73, 499 O.G. 3, 1939 C.D. 850; In re The Paris Medicine Co, 480

O.G. 6, 87 F.2d 484, 24 C.C.P.A., Patents, 854; Ex parte Stauffer Chemical Co., 81 U.S.P.Q. 255; Ex parte Pine Hill Products Co., 83 U.S.P.Q. 398; Ex parte Pond's Extract Co., 77 U.S.P.Q. 56; Ex parte Cube Steak Machine Co., 86 U.S.P.Q. 327; Ex parte Kops Brothers, Inc., 70 U.S.P.Q. 541; Ex parte Sperry Gyroscope Co., Inc., 77 U.S.P.Q. 634." (Italics ours.)

With respect to the contention of appellant that the notice of opposition should have been dismissed "for the reason that it does not allege facts showing that opposer would be damaged by the registration" sought, the Examiner of Interferences in his decision on the request for rehearing said:

"* * * should the applicant's theory as to the opposer's lack of interest in the subject matter be correct, no one could possess standing to oppose the registration of a mark upon the statutory grounds relied upon by the opposer in the present case."

The Assistant Commissioner stated:

"* * * The notice of opposition alleged that for many years prior to January, 1941, the date when applicant began the use of its mark, the opposer has been engaged in the business of manufacturing and selling carillons in interstate commerce, and this the applicant does not deny. It was further alleged that the term 'Carillonic Bells' cannot function as a trade-mark, is a misnomer and is therefore not a truly proper designation of the applicant's product. The examiner in his decision held that inasmuch as the parties are competitors in the sale of instruments consisting primarily of carillonic bells, the registration sought by the applicant would be injurious to the opposer as it would also be to any other producer of this character of product, and with this conclusion I am inclined to agree. The opposer has shown ample interest in the subject matter of this opposition, and I am not convinced by the applicant's arguments that the op-

position should have been dismissed. It has been established to my satisfaction that probability of damage to the opposer and other manufacturers of carillons of the type manufactured by the applicant would follow from the registration of the applicant's mark. Burmel Handkerchief Corporation v. Cluett, Peabody & Co., 127 F.2d 318, 29 C.C.P.A., Patents, 1024; Barber-Colman Co. v. Overhead Door Corporation, supra, 65 F.2d 147, 20 C.C.P.A., Patents, 1118.

We have considered carefully appellant's contentions as to the inapplicability of the decisions cited by the Assistant Commissioner but are unable to agree with such contentions.

The decision of the Assistant Commissioner is affirmed.

Affirmed.